United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 29, 1997 Decided November 4, 1997 

 No. 96-1007

 Sierra Club, 

 Petitioner

 v.

 Environmental Protection Agency, et al., 

 Respondents

 On Petition for Review of an Order of the 

 Environmental Protection Agency

 Howard I. Fox argued the cause for petitioner, with whom 
Robert E. Yuhnke was on the briefs. William S. Curtiss 
entered an appearance.

 Eileen T. McDonough, Attorney, U.S. Department of Jus-
tice, argued the cause for respondents, with whom Lois J. 
Schiffer, Assistant Attorney General, Sara Schneeberg, Attor-
ney, Environmental Protection Agency, and Peter J. Plocki, 


Attorney, U.S. Department of Transportation, were on the 
brief.

 Before: Edwards, Chief Judge, Ginsburg and Tatel, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: Section 176(c) of the Clean Air Act, 
as amended in 1990, provides that, before any transportation 
project, program, or plan ("transportation activities") located 
in air quality regions designated as "nonattainment areas" or 
"maintenance areas" can receive federal approval or funding, 
the transportation activity must be found to conform with the 
applicable State Implementation Plan ("SIP") or, if a SIP is 
not yet available for the region in question, with interim 
requirements. 42 U.S.C. s 7506(c) (1994 & Supp. 1995). 
Appellant Sierra Club challenges a regulation promulgated by 
the Administrator of the Environmental Protection Agency 
("EPA") providing for a twelve-month grace period during 
which transportation activities in designated nonattainment 
areas would be exempt from the transportation conformity 
requirements. See 60 Fed. Reg. 57,179 (1995); see also 40 
C.F.R. s 51.394(d) (1996).

 We hold that the challenged grace period is contrary to the 
plain meaning of the Clean Air Act. The Clean Air Act 
categorically mandates that the transportation conformity 
requirements shall apply to nonattainment and maintenance 
areas. 42 U.S.C. s 7506(c)(5) (Supp. 1995). The Act does not 
provide for any grace periods or other exemptions from the 
conformity requirements for areas designated as nonattain-
ment areas, nor does it authorize the EPA to create such 
exemptions. Thus, the grace period unlawfully narrows the 
Act's strict and broad ban against nonconforming transporta-
tion activities.

 I. Background

 The Clean Air Act establishes a joint state and federal 
program to control the nation's air pollution. Section 109 of 
the Act requires the EPA to establish National Ambient Air 


Quality Standards ("NAAQS") for certain pollutants. 42 
U.S.C. s 7409 (1994). Section 110 contemplates that the 
measures necessary to attain the NAAQS will be applied to 
individual sources of pollutants through SIPs, prepared by 
each state and subject to EPA review and approval, for each 
"air quality control region" within the state. s 7410. A SIP 
must specify emission limitations and other measures neces-
sary to attain and maintain the NAAQS for each pollutant. 
s 7410(a)(2)(A)-(K).

 Section 107(d)(1)(A) of the Act requires the Governor of 
each state to designate each air quality control region in the 
state as either: (1) nonattainment--the area does not meet 
the NAAQS or it contributes to ambient air quality in a 
nearby area that does not meet the NAAQS; (2) attain-
ment--the area meets the NAAQS and does not contribute to 
NAAQS violations in nearby areas; or (3) unclassifiable--
there is not sufficient information available for classification. 
s 7407(d)(1)(A). The EPA must establish the earliest practi-
cable attainment date for each nonattainment area, 
s 7502(a)(2), as well as a schedule by which the state must 
submit a SIP revision that complies with the requirements for 
nonattainment areas in order to attain the NAAQS ("control 
strategy"). s 7502(b), (c). Section 107(d)(3) establishes a 
process for redesignation to reflect changes in air quality over 
time. s 7407(d)(3). Redesignation requires notice in the 
Federal Register announcing the pending redesignation. 
s 7407(d)(2)(A). If a nonattainment area is found to have 
attained the NAAQS, it is redesignated as a "maintenance" 
area and must comply with a control strategy designed to 
maintain compliance with the NAAQS. s 7505a.

 In the 1970 Act, Congress required SIPs to include "trans-
portation control plans" as part of their strategy for achieving 
or maintaining attainment. Pub. L. No. 91-604 s 4(a), 84 
Stat. 1680 (1970). In 1977, Congress prescribed more strin-
gent transportation conformity requirements, including sec-
tion 176(c), which provides that federal agencies may not 
"engage in," "support in any way or provide financial assis-
tance for," "license or permit," or "approve" any transporta-


tion activity that does not "conform to" applicable SIPs. Pub. 
L. No. 95-95, tit. I s 129(b), 91 Stat. 749, 750 (1977). Con-
gress further strengthened the Act's transportation conformi-
ty requirements in 1990. Pub. L. No. 101-549, tit. I s 101(f), 
104 Stat. 2409, 2409-12 (1990). Section 176(c), as amended, 
integrates the Clean Air Act with the transportation planning 
process by conditioning federal approval and funding of trans-
portation activities on their demonstrated compliance with 
applicable SIPs. 42 U.S.C. s 7506(c)(1) (1994). Prior to 
approval of applicable SIP control strategies, transportation 
activities must comply with interim requirements by showing 
that the proposed activity will contribute to emissions reduc-
tions. s 7506(c)(3).

 In 1993, the EPA promulgated regulations establishing 
detailed "criteria and procedures for determining conformity 
under the statute." See 58 Fed. Reg. 62,188 (1993) (codified 
at 40 C.F.R. ss 51.390-51.464 (1996)); see also 42 U.S.C. 
s 7506(c)(4) (1994) (requiring EPA to promulgate regula-
tions). In 1995, the EPA promulgated amendments to these 
regulations, including the grace period at issue here:

 Grace period for new nonattainment areas. For areas 
 or portions of areas which have been in attainment for 
 either ozone, CO, PM-10, or NO2 since 1990 and are 
 subsequently redesignated to nonattainment for any of 
 these pollutants, the provisions of this subpart shall not 
 apply for such pollutant for 12 months following the date 
 of final designation to nonattainment.

60 Fed. Reg. 57,179, 57,184 (1995) (final agency action amend-
ing regulations) (codified at 40 C.F.R. s 51.394(d) (1996)).

 Appellant Sierra Club filed a timely petition for review of 
the grace period provision, arguing that it is contrary to the 
Clean Air Act. The EPA argues that Congress did not 
specifically address when newly designated nonattainment 
areas should become subject to the transportation conformity 
requirements, leaving this detail to the EPA, and defends the 
grace period as consistent with the statute and its goals.


 II. Analysis

A. Standing 

 The standing of petitioner to pursue this judicial challenge 
was questioned at oral argument. Petitioner asserts, and the 
EPA agrees, that petitioner's standing cannot be doubted. 
We agree.

 The transportation conformity requirements constitute a 
procedural rule under which transportation activities are re-
viewed to determine whether they conform to an area's SIP. 
This court recently discussed the three irreducible factors 
necessary for Article III standing--injury in fact, causation, 
and redressibility--in the context of procedural-rights cases 
in Florida Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 
1996) (en banc). "To demonstrate standing ... a procedural-
rights plaintiff must show not only that the defendant's acts 
omitted some procedural requirement, but also that it is 
substantially probable that the procedural breach will cause 
the essential injury to the plaintiff's own interest." Id. at 
664-65. There is no doubt that the grace period subjects 
affected parties to the environmental exposures which the 
regulatory provisions suspended by the grace period seek to 
limit. It follows that the grace period will cause injury to 
Sierra Club members residing in newly designated nonattain-
ment areas, and that this injury could be redressed by 
eliminating the grace period. Accordingly, Sierra Club has 
standing to petition for review of the grace period.

 The Government does not contest Sierra Club's standing. 
The Government's contention that the grace period will have 
no significant impact, because state regulatory provisions will 
ultimately minimize the impact of any injuries resulting from 
the challenged regulation, does not undermine Sierra Club's 
standing. Even if alternative protective measures might limit 
the harm caused by the relaxation of regulatory provisions, 
the existence of alternative "protective conditions" does not 
negate a party's standing to enforce statutorily mandated 
regulations. See National Wildlife Fed'n v. Hodel, 839 F.2d 
694, 713 (D.C. Cir. 1988) ("[T]he existence of other regula-


tions that impose 'protective conditions,' thereby limiting the 
possible harm" alleged does not undermine petitioner's stand-
ing.). Moreover, Sierra Club members would suffer harm at 
least until remedial measures offsetting emissions from non-
conforming activities were implemented, and this injury alone 
is sufficient to establish Sierra Club's standing.

B. Standard of Review 

 In Chevron U.S.A., Inc. v. Natural Resources Defense 
Council, Inc., 467 U.S. 837 (1984), the Supreme Court set out 
the now familiar two-step test for reviewing an agency's 
interpretation of a statute. First, the reviewing court must 
ask "whether Congress has directly spoken to the precise 
question at issue." Id. at 842. If so, "that is the end of the 
matter; for the court, as well as the agency, must give effect 
to the unambiguously expressed intent of Congress." Id. at 
842-43. If, however, "the statute is silent or ambiguous with 
respect to the specific issue," the reviewing court must defer 
to the agency's construction of the statute if it is reasonable. 
Id. at 843.

C. The Grace Period is Contrary to the Plain Meaning of 
 the Clean Air Act

 This case is controlled by the first step of Chevron. In 
amendments to the Clean Air Act enacted shortly after the 
EPA published the final rule at issue here, Congress clarified 
that the transportation conformity requirements apply to 
nonattainment areas and maintenance areas. Pub. L. No. 
104-59, tit. III, s 305(b), 109 Stat. 580 (Nov. 28, 1995) (codi-
fied at 42 U.S.C. s 7506(c)(5) (Supp. 1995)). In so doing, 
Congress adopted the EPA's long-standing construction of 
the conformity requirements. See EDF v. EPA, 82 F.3d 451, 
454 n.2 (D.C. Cir. 1996). While Congress took care to specify 
that areas remain subject to the conformity requirements 
following redesignation from "nonattainment" to "mainte-
nance" status, see 42 U.S.C. s 7506(c)(5)(B) (Supp. 1995), it 
did not provide any grace periods or other exemptions for 
areas redesignated from "attainment" to "nonattainment" sta-


tus. This cannot be read to imply that the EPA can create 
such an exemption via administrative rule. Indeed, this court 
has consistently struck down administrative narrowing of 
clear statutory mandates. See, e.g., Sierra Club v. EPA, 992 
F.2d 337, 343-45 (D.C. Cir. 1993) (where statute required 
groundwater monitoring by "facilities potentially receiving 
... [certain enumerated] wastes," EPA acted unlawfully 
when it required monitoring only at larger facilities receiving 
such wastes); Hercules Inc. v. EPA, 938 F.2d 276, 279-81 
(D.C. Cir. 1991) (where governing statute required federal 
agencies selling real property to notify the purchaser if 
hazardous waste had been stored on the property, EPA acted 
unlawfully in limiting notification to situations where the 
hazardous waste was stored "during the time the property 
was owned by the United States"). Accordingly, we hold that 
the grace period impermissibly creates an exception to the 
unqualified requirement in the statute that the federal gov-
ernment not approve a transportation activity unless that 
activity has complied with the conformity rules.

 Although the statute's plain language is sufficient to sup-
port our finding that Congress intended a strict and broad 
ban on nonconforming activities in all nonattainment areas, it 
is also instructive to consider some of the well-known reasons 
underlying Congress's decision to enact the 1990 amendments 
to the statute. Prior to the 1990 amendments, the Act's 
transportation conformity requirements were "largely ... 
ignored by the agencies required to apply it." 136 Cong. Rec. 
S16972 (daily ed. Oct. 27, 1990) (statement of Senator Bau-
cus); see also id. (explaining that "no transportation plan has 
ever been disapproved under [section 176(c)], even in cities 
where mobile source emission growth is a major factor in 
preventing attainment of the NAAQS"). The initial compli-
ance deadline in the 1970 Act (1975) and the extended dead-
lines set forth in the 1977 Amendments (1982 and 1987) 
passed unmet. See S. Rep. No. 228, at 10-11 (1989). Recog-
nizing that a large part of this failure was due to the 
propensity of the federal government to interfere with pollu-
tion control measures by approving, funding, or otherwise 
engaging in federal transportation activities which are incon-


sistent with applicable SIPs, see 136 Cong. Rec. S16972 (daily 
ed. Oct. 27, 1990) (statement of Senator Baucus), Congress 
strengthened section 176(c) to eliminate noncompliance with 
the transportation conformity requirements by conditioning 
federal approval and funding of transportation activities in 
nonattainment and maintenance areas on their demonstrated 
compliance with the transportation conformity requirements. 
42 U.S.C. s 7506(c)(1) (1994) (conditioning federal action on 
transportation activity's demonstrated compliance with the 
applicable SIP); s 7506(c)(3) (conditioning federal action on a 
showing that the proposed activity will contribute to emis-
sions reductions where applicable SIP control strategies are 
not yet in place).

 The Government offers three arguments in defense of the 
challenged regulation. First, the Government asserts that 
Congress included a similar twelve-month grace period in 
subsection 176(c)(3)(B)(i), and thus the challenged grace peri-
od is not contrary to the Act. See 60 Fed. Reg. 57,179, 57,182 
(1995); 60 Fed. Reg. 44,790, 44,796 (1995). Second, the 
Government argues that the challenged regulation is justified 
by subsection 176(c)(4)(B)(ii), which requires the EPA to 
determine "the appropriate frequency for making conformity 
determinations." See Respondent's Brief at 18-20. Third, 
the Government argues that this court's reasoning in Sierra 
Club v. EPA, 719 F.2d 436 (D.C. Cir. 1983), authorizes the 
EPA to promulgate the challenged grace period. See 60 Fed. 
Reg. at 57,182; 60 Fed. Reg. at 44,796. We reject all three 
justifications.

 The Government's first two arguments confuse statutory 
provisions pertaining to the criteria and procedures for dem-
onstrating whether transportation activities in fact comply 
with the transportation conformity requirements with 
the issue of which transportation activities are required 
to comply. First, the Government construes subsection 
176(c)(3)(B)(i) as a twelve-month grace period similar to the 
challenged grace period. See 60 Fed. Reg. at 57,182; 60 Fed. 
Reg. at 44,796. When read in context, however, it becomes 
clear that subsection 176(c)(3)(B)(i) does not provide a twelve-
month exemption from the conformity requirements but rath-


er prescribes interim criteria and procedures for demonstrat-
ing the compliance of transportation activities in nonattain-
ment and maintenance areas in the absence of an appropriate 
SIP control strategy. See 42 U.S.C. s 7506(c)(3) (1994) (pro-
viding interim requirements applicable until an appropriate 
SIP control strategy is in place); see also s 7506(c)(4)(C) 
(requiring each state to submit "a revision to its [SIP] that 
includes criteria and procedures for assessing the conformity 
of any [transportation activity] subject to the conformity 
requirements"). In contrast, the challenged grace period 
creates a twelve-month exemption from the transportation 
conformity requirements. See 40 C.F.R. s 51.394(d) (provid-
ing that "the provisions of this subpart shall not apply ... for 
12 months following the date of final designation to nonattain-
ment") (emphasis added). Thus, the so-called "grace-period" 
in subsection 176(c)(3)(B)(i) in no way resembles the chal-
lenged grace period. Even if it did, however, it would not 
provide authority for the challenged grace period. On the 
contrary, had Congress provided some exemptions from the 
conformity requirements but not the particular exemption at 
issue here, this would militate against the validity of creating 
additional exemptions via administrative rule. See, e.g., Sier-
ra Club, 719 F.2d at 453 (D.C. Cir. 1983) (when a statute lists 
several specific exemptions to the general purpose, others 
should not be implied).

 The Government's attempt to rely on subsection 
176(c)(4)(B)(ii) also confuses statutory provisions pertaining to 
the manner of demonstrating conformity with the applicabili-
ty of the conformity requirements. Section 176(c)(4) only 
authorizes the EPA to prescribe the manner and frequency of 
determining compliance with section 176, and nothing in this 
section can be properly construed as authorizing the Agency 
to exempt transportation activities in some nonattainment 
areas from the conformity requirements. Subsection 
176(c)(4)(A) directs the agency to "promulgate criteria and 
procedures for demonstrating and assuring conformity" 
of transportation activities subject to the conformity require-
ments. 42 U.S.C. s 7506(c)(4)(A) (1994). Subsection 
176(c)(4)(B)(ii) further requires the EPA to "address the 


appropriate frequency for making conformity determina-
tions," provided that such determinations are not "less fre-
quent than every three years." s 7506(c)(4)(B)(ii).

 The EPA attempts to support its argument that subsection 
176(c)(4)(B)(ii) authorizes the challenged grace period by com-
paring the grace period at issue here with the "grandfather" 
provision upheld in EDF v. EPA, 82 F.3d 451 (D.C. Cir. 
1996). However, EDF does not support the EPA's argument. 
The regulations at issue in EDF were challenged on the 
ground that they "exempt from the conformity determination 
requirements ... [transportation] projects that have under-
gone recent National Environmental Policy Act (NEPA) anal-
yses ... within the preceding three years." 82 F.3d at 456; 
see also 40 C.F.R. s 51.394(c)(1) (1994). This court reasoned 
that, since section 176(c)(4) clearly authorizes the EPA to 
determine the criteria and procedures for demonstrating 
conformity as well as the frequency of conformity determina-
tions, the EPA's substitution of NEPA analyses for the 
newly-promulgated conformity requirements, so long as the 
NEPA analysis was performed within three years, was a 
proper exercise of the authority expressly delegated to the 
EPA by the statute. Id. at 456-47.

 The transportation activities at issue in EDF were in 
nonattainment areas throughout the relevant period and thus 
were required to comply with the transportation conformity 
requirements. Significantly, the EDF court noted that the 
challenged rules "require generally that conformity determi-
nations for covered projects be made before any federal 
action is taken on them." Id. at 456. The only thing that had 
changed was the specific criteria and procedures used to 
demonstrate conformity, in that transportation activities 
which had recently undergone a NEPA analysis were allowed 
to proceed, using the recent NEPA analysis as a reasonable 
equivalent to the conformity determination required under 
section 176(c). By allowing such a substitution, the regula-
tion upheld in EDF merely provided a three-year period of 
repose for a transportation activity which had already under-
gone an extensive environmental impact review.


 In contrast, this case involves the applicability of the Act's 
transportation conformity requirements following the revision 
of an area's attainment status. Under the Act, designation of 
an area as nonattainment triggers the applicability of the 
transportation conformity requirements. See 42 U.S.C. 
s 7506(c)(5) (Supp. 1995). Unlike in EDF, the regulation at 
issue here does not pertain merely to the specific procedures 
and criteria used to determine compliance or to how often an 
activity must go through a compliance determination process, 
but rather whether an activity must be found to comply at all 
before it can be approved or funded. Indeed, transportation 
activities which are exempt from the conformity requirements 
under the disputed grace period may not have undergone any 
environmental impact review. While the holding in EDF 
rested squarely on the Act's delegation of authority to the 
EPA to specify the criteria and procedures for determining 
conformity as well as the frequency of conformity determina-
tions, the Act does not authorize the EPA to limit the 
applicability of the conformity requirements by exempting 
some nonattainment areas, even for a limited period of time. 
Thus, neither the statutory provision at issue in EDF nor the 
Court's reasoning in EDF supports EPA's claim of authority 
to promulgate the regulation challenged here.

 The EPA's reliance on this court's reasoning in Sierra Club 
v. EPA, 719 F.2d 436 (D.C. Cir. 1983), as authority for the 
challenged regulation is also without merit. Sierra Club 
involved the EPA's duty to apply retroactively a regulation 
promulgated to implement a statutory mandate. To resolve 
this issue, this court applied the same test which we have 
applied to determine the limits of an agency's power to apply 
a regulation retroactively. Id. at 467. The factors relied on 
in Sierra Club echo the anti-retroactivity principles tradition-
ally considered when evaluating whether legislation should be 
applied retroactively. Cf. Landgraf v. USI Film Products, 
511 U.S. 244 (1994) (discussing evolution and application of 
anti-retroactivity principles).

 Unlike Sierra Club and the cases on which it relies, howev-
er, this case involves an administrative agency's authority to 
limit the prospective, rather than retroactive, application of 


regulations implementing a statutory mandate. The Govern-
ment acknowledges that this case differs from Sierra Club. 
60 Fed. Reg. 57,179, 57,182 (1995). The Government errone-
ously dismisses the importance of this distinction, however, 
arguing that the legal analysis articulated in Sierra Club 
"applies equally to grandfathering from new requirements." 
Id. The Government asserts that the anti-retroactivity prin-
ciples applied in Sierra Club justify the challenged grace 
period because "[i]mmediate application of all conformity 
requirements ... would seriously prejudice the affected ar-
eas, which have relied on their status as attainment areas 
exempt from conformity and have not previously conducted 
the analyses necessary for conformity determinations." Re-
spondent's Br. at 23. This is a ridiculous claim. This court 
has never treated the type of harm alleged by the Govern-
ment as a sort of "retroactivity" violating any legal standard. 
See Direct TV, Inc. v. FCC, 119 F.3d 816, 826 (D.C. Cir. 1997) 
(rejecting claim that, because petitioner had expended mil-
lions of dollars in reliance on prior regulatory scheme, change 
in regulatory scheme was "secondarily retroactive" as applied 
to petitioner and that, therefore, anti-retroactivity principles 
should apply to exempt petitioner from new regulation); see 
also Landgraf, 511 U.S. at 269-70 n.24 ("Even uncontrover-
sially prospective statutes may unsettle expectations and 
impose burdens on past conduct[, for example,] a new proper-
ty tax or zoning regulation may upset the reasonable expecta-
tions that prompted those affected to acquire property," but 
this does not render the application of new laws invalid.).

 The absurdity of the EPA's argument is seen in the fact 
that the challenged grace period is not limited only to those 
regulated entities whose expectations arguably were adverse-
ly affected by the 1990 amendments to the Act. EPA regula-
tions promulgated in 1993 to implement the 1990 amendments 
did not include any grace periods for designated nonattain-
ment areas. See 58 Fed. Reg. 62,188 (1993). Yet, under the 
EPA's 1995 amendment to its 1993 regulations, regulated 
entities that are now fully on notice of the consequences of 
nonattainment would be given an exemption from conformity 


requirements in clear defiance of the statute. EPA's attempt 
to justify this position falls flat.

 Sierra Club and the cases on which it relied involved 
agencies' duty or authority to apply regulations retroactively. 
In contrast, this case involves an agency's effort to create 
exemptions from a prospective statutory mandate. Absent a 
showing of retroactivity, the challenged exemptions must be 
treated no differently than any other administrative exemp-
tion from a categorical statutory mandate, and thus Sierra 
Club is inapposite here. The Government's argument that 
the line drawn between retrospective and prospective laws 
can be disregarded where, as here, the exemption from the 
conformity requirements--termed "grandfathering" by the 
Government--is limited to a one-year period, see 60 Fed. 
Reg. at 57,182, is without merit. Although it is certainly 
within Congress's power to provide such grandfathering pro-
visions, neither administrative agencies nor courts may do so 
in the absence clear statutory authority. Nothing in Sierra 
Club suggests the contrary.

 III. Conclusion

 We hold that EPA's proposed grace period exempting 
designated nonattainment areas from the Clean Air Act's 
transportation conformity requirements violates the plain 
terms of the Act and, therefore, is unlawful. Accordingly, the 
petition for review is granted.

 So ordered.